RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0214P (6th Cir.)
File Name: 00a0214p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee,*

            v.                                    No. 97-5966

CHALMER C. HAYES, also
known as Chuck Hayes, also
known as Charles Hayes,
    *Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Kentucky at London.
No. 96-00060—Jennifer B. Coffman, District Judge.

Argued: May 2, 2000

Decided and Filed: June 30, 2000

Before: MOORE and GILMAN, Circuit Judges;
McKEAGUE,* District Judge.

_____

*The Honorable David W. McKeague, United States District Judge for the Western District of Michigan, sitting by designation.

1

————————————

**COUNSEL**

**ARGUED:**    Kenneth S. Siegel, Tampa, Florida, for Appellant.  Charles P. Wisdom, Jr., ASSISTANT UNITED STATES ATTORNEY, Lexington, Kentucky, for Appellee.  **ON BRIEF:**    Kenneth S. Siegel, Tampa, Florida, for Appellant.  Charles P. Wisdom, Jr., Patrick H. Molloy, ASSISTANT UNITED STATES ATTORNEYS, Lexington, Kentucky, Martin L. Hatfield, ASSISTANT UNITED STATES ATTORNEY, London, Kentucky, for Appellee.

————————————

**OPINION**

————————————

RONALD LEE GILMAN, Circuit Judge.  In 1996, Chalmer Hayes agreed to pay a man $5,000 to kill his son. Unfortunately for Hayes (but fortunately for his son), the man he tried to hire was an undercover FBI agent.  Hayes was subsequently arrested, indicted, and convicted of murder for hire, in violation of 18 U.S.C. § 1958.  For the reasons set forth below, we **AFFIRM** Hayes's conviction.

## I.  BACKGROUND

Madge Hayes Beckett, Chalmer Hayes's mother, died on December 24, 1994.  She left her grandson, John Hayes (Chalmer Hayes's son), nearly all of an estate valued at $895,000. To her two sons, she left almost nothing. Chalmer Hayes received only $1,000 under the terms of his mother's will.  Even so, he made out better than his brother, Brady Hayes, who was left $500.

Madge Hayes Beckett executed her will, which named her grandson as the executor of her estate, less than two months before she died.  Her will was probated on January 18, 1995. The very next day, Chalmer Hayes filed suit against John Hayes in Kentucky state court, alleging that his son had

not be authorized to disturb the district court's ruling even if we were of the opinion that it was erroneous. A court of appeals can reverse a district court's ruling pursuant to Rule 52(b) only if, among other things, the ruling "affect[ed] substantial rights." *United States v. Olano*, 507 U.S. 725, 732 (1993). With the possible exception of "structural defect[s]" that affect "the framework within which the trial proceeds," *Arizona v. Fulminante*, 499 U.S. 279, 309 (1991), the phrase "affect substantial rights" means "prejudicial" in the sense that the asserted error "must have affected the outcome of the district court proceedings." *Olano*, 507 U.S. at 734. Because there is no reasonable possibility that the district court's ruling affected the outcome of this case, Rule 52(b) affords Chalmer Hayes no basis for relief, even if the district court's ruling was erroneous.

For the same reason, even if Chalmer Hayes's attorney had clearly pressed his Confrontation Clause argument in the district court, the ruling would have to be considered harmless beyond a reasonable doubt, even if it was erroneous. *See Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986) (concluding that a violation of the Confrontation Clause does not require reversal of a conviction if "assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt").

In summary, because Chalmer Hayes would not be entitled to relief even we were to conclude that his rights under the Confrontation Clause were violated, the question of whether the district court's ruling in fact violated the Confrontation Clause is one that we need not and do not address.

## III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.

exerted undue influence over Madge Hayes Beckett and had coerced her into signing the will. Chalmer Hayes asserted that he was entitled to all of his mother's estate.

The will contest became highly acrimonious. At John Hayes's behest, Chalmer Hayes, who lived on property in Nancy, Kentucky that had belonged to his mother—and now belonged to his son—was ordered by the court to pack up his belongings and move. This, of course, did not improve the relationship between father and son. Originally, the court had required that Chalmer Hayes vacate the property by July 27, 1996. At Chalmer Hayes's request, the court granted him an extension until November 1, 1996 to leave and remove his belongings. He subsequently sought additional extensions of time, but the court rejected the requests.

Several months earlier, in June of 1996, Chalmer Hayes was interviewed by a journalist and author named Lawrence Myers. Myers's interest in Chalmer Hayes was apparently due to the latter's claim of having been a contract agent of the Central Intelligence Agency (CIA) over a period of forty-two years. (There is apparently no truth to this claim; the CIA denied ever having heard of Chalmer Hayes.) The relationship between the two men is significant, because Chalmer Hayes's sole argument on appeal revolves around Myers's involvement in this case.

In late July of 1996, Chalmer Hayes telephoned Myers. Shortly thereafter, Myers returned the call. During the conversation, Chalmer Hayes asked Myers if he knew what the phrase "wet work" meant. After consulting a reference book, Myers replied that he understood the phrase to be the English translation of a Russian euphemism for assassination. Chalmer Hayes told Myers that his understanding was correct, and that he needed a "wet boy" to do a job for him in Nancy, because there was a drug dealer from Louisville that he wanted killed. Myers suggested to Chalmer Hayes that he was "talking out of his head," and quite possibly violating the law simply by broaching the topic. Chalmer Hayes responded that he was very serious about his plan.

On August 27, 1996, Chalmer Hayes met Myers in Nancy. Over coffee, Chalmer Hayes passed to Myers a piece of paper with John Hayes's name, address, and telephone number. Chalmer Hayes described John Hayes (although he told Myers that he and John Hayes were not related) as a thirty-six year-old white male who used and sold cocaine, and drove a beige GMC mini-Blazer. He repeated that John Hayes was a drug dealer who was "going to die" because Chalmer Hayes was going to have him killed.

Either that day or the next, Chalmer Hayes faxed Myers a note requesting that Myers call him back. When Myers returned the call, Chalmer Hayes said that he was very upset because John Hayes had just paid him an unwanted visit, and reiterated that he wanted Myers to arrange to contact someone who could kill John Hayes. Myers suggested that Chalmer Hayes simply call the police if John Hayes was bothering him, but this suggestion was rejected. Chalmer Hayes then told Myers that if he would not help, Hayes would hire an individual named Roy, who had purportedly agreed to kill John Hayes. At that point Myers telephoned Stephen Brannan, a special agent of the Federal Bureau of Investigation (FBI) based in Birmingham, Alabama, with whom Myers was acquainted, to inform him that Chalmer Hayes was plotting to have John Hayes killed.

In early September of 1996, Myers again spoke with Chalmer Hayes, who told Myers that he "still had this problem and still wanted somebody to help him." Myers informed Agent Brannan of this conversation. At Agent Brannan's direction, Myers told Chalmer Hayes that he "might know" someone who could help, and that if this person was to call Chalmer Hayes, he would identify himself by saying that he "just talked to the guy that you gave a couple of tobacco pipes."

Soon thereafter, Agent Brannan arranged for FBI Special Agent Don Yarbrough to pretend to be a hit man and to conduct an undercover investigation. On September 10, 1996, Agent Yarbrough telephoned Chalmer Hayes. The

additional impeachment questions could have affected the outcome of this case.

In fact, even on appeal, Chalmer Hayes struggles to explain why the additional questions his attorney was precluded from asking Myers were significant. He argues that additional impeachment might have made Myers seem less truthful and more likely biased against Chalmer Hayes, thus making the jury less willing to credit his testimony. But even if the jury had decided to disregard all of Myers's testimony, that still left Chalmer Hayes with the very significant problem of having been tape recorded attempting to hire an undercover FBI agent to murder his son.

The audiotapes spoke for themselves. Chalmer Hayes did not argue that his coded conversations with Agent Yarbrough were ambiguous and that Myers's testimony was a Rosetta Stone without which the jury might have had doubts about what Chalmer Hayes and Agent Yarbrough were discussing. Instead, he rested his defense on the completely incredible argument that he suspected all along that Agent Yarbrough was an FBI agent, and that he was simply playing along in an attempt to embarrass the FBI.

But even if the jury had additional reasons to disbelieve Myers's testimony, there is no basis in the record or in logic to find that those additional reasons would support Chalmer Hayes's "playing along" argument. In short, even if the jury had additional reasons to conclude that Myers was not to be believed, Chalmer Hayes never explains why those reasons might have made the jury any more apt to believe Chalmer Hayes when he testified that he suspected all along that Myers was setting him up. Chalmer Hayes does not argue that *he* knew that Myers was being investigated for perjury, much less that he was aware of any concern that Myers might have had about being investigated, and that would be the only conceivable way for the district court's ruling to have affected the jury's verdict.

For this reason, assuming that the appropriate standard of review is the "plain error" standard of Rule 52(b), we would

Agent Brannan in the hope that the FBI might try to intercede with the Tennessee state officials on Myers's behalf. The district court again asked counsel what else, if anything, he hoped to elicit from Myers. Counsel responded, "that may not be the exclusive list, but hopefully things will occur to me."

In context, we cannot agree with Chalmer Hayes's assertion on appeal that his attorney made a "particularized inquiry [that] unmistakably would have established strong motivation for currying favor with the Government." Quite to the contrary. Counsel's statement that "hopefully things will occur to me" no doubt gave the district court the (justified) impression that counsel was seeking a license to conduct a fishing expedition. We recognize that counsel may not have known about Myers's history until after the trial began, and that the district court continued the trial for this very reason. Nevertheless, Chalmer Hayes does not argue that the government failed to disclose any documents or information that it was obligated to disclose, or that he was afforded inadequate time to prepare his defense, including his renewed examination of Myers.

In any event, the district court permitted counsel to conduct an absolutely devastating impeachment of Myers. Putting aside the fact that counsel was able to introduce into evidence the facts that Myers had once pled guilty in California to grand theft and that Myers had contacted Agent Brannan on prior occasions with the hope of cultivating him as a journalistic source, counsel was permitted to call as a witness one of the Tennessee prosecutors. From the witness stand, the prosecutor warned the jury that based on her experience with Myers, i.e., her involvement with the Tennessee murder-for-hire case, Myers was a "professional pathological liar" who was "not to be believed." We recognize that one might draw a distinction between a person whose testimony is generally unreliable because he lies pathologically and a person who has a particular motivation to tell a specific falsehood in order to bring about a calculated result. Nevertheless, it is difficult to imagine that counsel's proposed

conversation was secretly audiotaped by Agent Yarbrough. Agent Yarbrough identified himself by using the line about the tobacco pipes. Chalmer Hayes said he knew who Yarbrough was talking about, and asked Yarbrough for "help." Specifically, he identified and described John Hayes and the beige mini-Blazer he drove, and expressed a desire to meet in person to discuss the particulars of the "help" he was asking Yarbrough to provide. At Agent Yarbrough's request, Chalmer Hayes subsequently mailed Yarbrough a photograph of John Hayes to a post office box address that Yarbrough had provided. Around this time, the FBI determined that John Hayes was Chalmer Hayes's son.

On September 20, 1996, Chalmer Hayes and Agent Yarbrough had another telephone conversation. Like their first discussion, this conversation was audiotaped without Chalmer Hayes's knowledge. Agent Yarbrough asked Chalmer Hayes to clarify whether he wanted "the full treatment" or simply wanted "the boy scared." Chalmer Hayes replied that he wanted "the full treatment" and emphasized that he "want[ed] him out of the way."

On October 10, 1996, Chalmer Hayes and Agent Yarbrough met in Kentucky at the Nancy property to discuss the proposed hit. This was a prearranged meeting, and it was the first time that the two of them had met face-to-face. Also present, but out of sight, were Agent Brannan and another FBI agent, David Keller, who were conducting remote surveillance. The ostensible purpose of this meeting was for Agent Yarbrough and Chalmer Hayes to work out the terms of Yarbrough's services as a contract killer. Agent Yarbrough negotiated a price of $5,000, with a $100 deposit payable in advance and the remainder payable seven days after the murder. The two agreed that Yarbrough would return to Birmingham and, from there, telephone Chalmer Hayes to explain whether the job had been completed by saying if the weather was "good" or "bad" in Birmingham.

A week later, on October 17, 1996, Agent Yarbrough met with Chalmer Hayes again. Agent Yarbrough told Chalmer

Hayes that he was on his way to Louisville to do the job. Chalmer Hayes confirmed that he wanted John Hayes dead and preferred that his body not be found. On October 21, 1996, Agent Yarbrough telephoned Chalmer Hayes and told him that he was in Birmingham and that "the weather down here is absolutely drop dead gorgeous," meaning that everything had gone according to plan. The FBI arrested Chalmer Hayes later that day.

Myers was one of the witnesses who testified against Chalmer Hayes in the murder-for-hire trial that is the subject of this appeal. Incredibly, Myers had been the target of another, completely unrelated, murder-for-hire plot in Tennessee several years earlier. Apparently, an individual who was the subject of a news article that Myers had written was less than pleased with Myers's work. *See State v. Shuck*, 953 S.W.2d 662, 665 (Tenn. 1997); *Politician Sentenced For Trying To Hire Hit Man To Kill Reporter*, THE TENNESSEAN, July 30, 1998, at 4B. During the ensuing Tennessee murder-for-hire trial of the individual who wanted Myers killed, the Tennessee state prosecutor called Myers as a witness. To the prosecutor's chagrin, Myers testified in a manner that was unfavorable to the prosecution, favorable to the defendant, and, moreover, contradicted what he had written about the individual in the news stories that precipitated the murder-for-hire scheme. The prosecutor in the Tennessee case believed that Myers had lied on the stand, although Myers was apparently never charged with perjury or any other offense as a result of his testimony.

Shortly after Myers's testimony as a witness for the government in the present case, counsel for Chalmer Hayes learned about the Tennessee murder-for-hire case in which Myers was involved. He sought to recall Myers to testify as a hostile witness in order to ask him about his testimony in the Tennessee case. At the request of Chalmer Hayes, the district court granted an eleven-day continuance so that counsel could prepare for this line of questioning.

("[T]he Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.").

The government argues, however, that Chalmer Hayes did not fairly raise his Confrontation Clause argument in the district court. We agree. This court has held that Confrontation Clause arguments not presented to the district court typically will not be heard on appeal. *See United States v. Bingham*, 81 F.3d 617, 630 (6th Cir. 1996) (declining to consider a Confrontation Clause argument because, among other reasons, it was not raised in the district court); *United States v. Atisha*, 804 F.2d 920, 930 (6th Cir. 1986) (rejecting a Confrontation Clause claim because, among other reasons, the defendant did not argue in the district court that his proposed cross-examination, to which the government objected on relevancy grounds, was intended to demonstrate bias, prejudice, or motive). But, as noted above, this general rule is one of prudence rather than a limitation on this court's jurisdiction.

Chalmer Hayes concedes that his attorney "did not literally use the words 'bias, prejudice [or] motive'" in responding to the government's motion in limine, but argues that the district court "readily should have recognized that [Chalmer] Hayes wanted to inform the jury of a formidable incentive for Myers to be partial to the government." We disagree.

The district court specifically asked Chalmer Hayes's attorney what else he wished to elicit from Myers, other than the fact that Myers had testified in another murder-for-hire case. Counsel responded, "Well, I was going to find out whether he knew he was under investigation for his testimony in that case." He was not more specific, and he certainly did not explain his theory of why this line of questioning was relevant to discerning possible bias, prejudice, or motive, i.e., that Myers might have been biased because he may have believed himself at risk of being prosecuted for perjury, and thus could have been motivated to ingratiate himself with

should be granted); *Hormel v. Helvering*, 312 U.S. 552, 557 (1941) ("A rigid and undeviating judicially declared practice under which courts of review would invariably and under all circumstances decline to consider all questions which had not previously been specifically urged would be out of harmony with . . . the rules of fundamental justice.").

Indeed, *Scarborough* itself apparently involved (although it never says so) a suppression issue that Rule 12 required be asserted before trial. Putting to one side the fact that *Scarborough* and *Crismon* cannot easily be reconciled with Rule 52(b) or prior published decisions of this court, *see Sowards v. Loudon County*, 203 F.3d 426, 431 n.1 (6th Cir. 2000) (noting the general rule that when a decision by one panel of this court is inconsistent with a prior published opinion by another panel of this court, the earlier case controls), the short answer is that the present case simply does not involve the Rule 12 forfeiture provision at issue in *Scarborough*, whether or not that provision's barrier to review is jurisdictional. We therefore have jurisdiction to consider the merits of Chalmer Hayes's Confrontation Clause claim, even though it was not properly raised below.

## B. Merits

The Supreme Court has recognized that the right to confrontation "means more than being allowed to confront the witness physically," *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986) (citation and quotations omitted), and that "[t]he main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination," *id*. (citations and quotations omitted) (alteration in original). The Supreme Court has also recognized that exposing a witness's motivation for testifying is an important part of the right guaranteed by the Confrontation Clause, although defendants do not have a constitutional right to impeach witnesses endlessly, even for bias. *See id*. at 679 ("[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . cross-examination . . . ."); *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam)

The government made an oral motion in limine to prevent counsel for Chalmer Hayes from making the examination of Myers a lengthy rehash of the facts of the Tennessee murder-for-hire trial. After first suggesting that Myers's testimony in the Tennessee case was an appropriate subject for examination because it "show[ed] a course of conduct or behavior which could be used to impeach him," counsel for Chalmer Hayes explained that he wanted to ask Myers "whether he knew he was under investigation for his testimony in [the Tennessee case]." (Actually, apart from representations by Chalmer Hayes's attorney to the district court in this case, there is no indication in the record that the Tennessee state prosecutors had ever considered charging Myers with perjury, much less that Myers knew about it.)

The district court granted the government's motion in part, holding that defense counsel would not be permitted to inquire into the underlying facts of the Tennessee case beyond the fact that it was another murder-for-hire case in which Myers had testified. But the district court also held that Chalmer Hayes could call as a witness one of the Tennessee state prosecutors, and that counsel could ask the prosecutor about Myers's reputation for truthfulness. Chalmer Hayes's attorney did indeed call one of the Tennessee state prosecutors as a witness, and she testified that from her dealings with Myers in the Tennessee murder-for-hire case, she had formed the opinion that Myers was a "professional pathological liar and not to be believed." (Technically, this answer was not directly responsive to the question asked, although opinion evidence about a witness's truthfulness is also an acceptable method of witness impeachment under Rule 405 of the Federal Rules of Evidence.)

Chalmer Hayes also testified. He denied that he had asked Myers to arrange for the murder of John Hayes. On the other hand, he admitted that the voice on the recordings with Agent Yarbrough was his, and also admitted that what he had discussed with Agent Yarbrough was murder-for-hire. His explanation was that he was not serious. Specifically, he argued that the FBI had been trying to set him up because of

his outspoken criticism of corruption in the United States government, and also so that the government could avoid compensating him for his supposed CIA service. He testified that he had, in fact, known all along that Yarbrough was an FBI agent, but was just playing along in order to embarrass the FBI. Apparently unimpressed with this explanation, the jury convicted him. He was sentenced to 120 months of imprisonment.

On appeal, Chalmer Hayes's sole argument is that the district court violated his rights under the Confrontation Clause of the Sixth Amendment by not allowing him to inquire specifically about whether Myers knew that the Tennessee state prosecutors were considering filing perjury charges against him. Had the district court not precluded this line of questioning, he argues, he would have been able to show that Myers had a strong motive to curry favor with the FBI, because Myers may have thought that if he helped the FBI set up and convict Chalmer Hayes, FBI officials would be grateful and might persuade the Tennessee authorities not to indict Myers for perjury.

## II. ANALYSIS

### A. Jurisdiction

Relying on this court's decision in *United States v. Scarborough*, 43 F.3d 1021 (6th Cir. 1994), the government asserts that "[c]onstitutional claims that were not raised in the district court are waived," with the effect that this court lacks jurisdiction to consider them. This assertion is incorrect, and because it concerns our power to adjudicate the merits of this appeal, we address it at the outset.

Ordinarily, the courts of appeals do not consider claims or arguments that were not raised in the district court. But this is a prudential rule, not a jurisdictional one. *See* FED. R. CRIM. P. 52(b) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."); *Austin v. Healey*, 5 F.3d 598, 601 (2d Cir. 1993) (noting that although the courts of appeals

generally avoid considering issues not passed upon below, "this rule is one of prudence (and does not limit [the appellate court's] jurisdiction)," and leaves the courts of appeals with "considerable discretion to decide questions not raised initially in the district court"); *United States v. Finch*, 998 F.2d 349, 354-55 (6th Cir. 1993) (noting that, consistent with Rule 52(b) of the Federal Rules of Criminal Procedure, this court "may take notice of an error on its own motion though it is never put forward by counsel").

On the other hand, this court has held in published opinions preceding *Scarborough* that this court may, in its discretion, decline to entertain constitutional claims that were not first raised in the district court. *See United States v. Miller*, 316 F.2d 81, 84 (6th Cir. 1963) (declining, as a matter of discretion and consistent with Rule 52(b), to address a Fourth Amendment suppression argument on appeal because in the district court, the defendants objected to the evidence solely on other grounds).

The sentence in *Scarborough* from which the government extracts the principle that any constitutional claim not raised in the district court is "conclusively deemed to be waived" is derived from cases applying Rule 12 of the Federal Rules of Criminal Procedure. Rule 12 requires certain claims and defenses (none of which are at issue in this case) to be raised before trial, and provides that those claims and defenses are forfeited if they are not timely asserted. *See, e.g.*, *United States v. Crismon*, 905 F.2d 966, 969-70 (6th Cir. 1990) (per curiam) (stating that this court is "categorically without jurisdiction to hear appeals of suppression issues raised for the first time on appeal," but then suggesting cryptically that this court was deprived of "jurisdiction" by the defendants' failure to make any facial showing that their default was excused by "good cause."). *Cf. United States v. Olano*, 507 U.S. 725, 732 (1993) (concluding that a court of appeals may correct "plain" but forfeited errors pursuant to Rule 52(b) only if the requirements of Rule 52(b) are met, but that it must consider whether the asserted error meets the rule's requirements so that it can determine whether relief can and