**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Dennis RADFORD, Defendant–**
**Appellant.**

No. 00–1029.

United States Court of Appeals,
Sixth Circuit.

June 19, 2001.

Before BOGGS and CLAY, Circuit Judges, and GWIN, District Judge.[*]

PER CURIAM.

This case arose out of a federal probe of corruption and abuse of power in the Detroit Police Department's Sixth Precinct. The investigation, which began with citizen complaints against officers Kenneth Owens and Arnold Redd, uncovered information that a group often officers were planting evidence, stealing property, committing armed robberies, and violating civil rights by engaging in unconstitutional searches.[1] FBI agents examining run sheets, daily details, and activity logs generated by Owens and Redd over a two-year period detected a pattern of suspicious incidents, the most common (and obvious, it seems) of which were reports that the officers had seized substantial quantities of illicit drugs but recovered minimal amounts of cash. The FBI considered these reports consistent with the citizen complaints of theft. Officer Dennis Radford participated in one such suspicious incident, the February 10, 1996, search of 14245 Bentler Street in Detroit.

According to police reports completed by Radford and three other officers involved in the search, they arrived at the house in response to a 911 call about a rape in progress, a violation of Michigan's Criminal Sexual Conduct ("CSC") statute, M.C.L.A. § 750 .520b. Redd and Owens arrived first, while Radford and his partner, Christopher Hatcher, provided backup. The officers entered the house without a warrant. They found no woman inside the house and no evidence of a rape. Nevertheless, they arrested four male occupants of the house on various charges, including possession of illegal drugs.

The FBI's investigation revealed that Redd and Owens, from the beginning of their shift, had planned to "hit" 14245 Bentler because they suspected it was a "dope house." In order to justify their warrantless entry, they made a bogus 911 call reporting that a woman had just been dragged into the house by two armed men who intended to rape her. Since they knew that the report they had phoned in was bogus, the officers had no probable cause to believe a crime was in progress, and the entry into the house violated the Fourth Amendment's prohibition on unreasonable searches. In addition, the officers falsely accused one of the four arrestees of possessing heroin, and he was wrongfully

---

[*] The Honorable James S. Gwin, United States District Judge for the Northern District of Ohio, sitting by designation.

[1] Of the ten officers indicted, the government dismissed charges against one, another was acquitted by a jury, two more won FED. R. CRIM. P. 29 motions for judgments of acquittal, and six were convicted.

convicted of that offense. At least one of the officers stole money from two of the arrestees.

A federal grand jury investigating the allegations of theft, injury, intimidation, and false arrest (all of which amount to civil rights violations, under the circumstances) issued a subpoena for the testimony of officer Radford. He was asked about the justification for entering the house without a warrant. As detailed below, he testified under oath that he made entry into the house because he believed that a rape was in progress or evidence of a rape could be found. He claimed that these beliefs were based on the 911 report relayed through dispatch and supplied probable cause to support a warrantless search of the house. The underscored portion of Radford's testimony, reprinted here in context, is central to this appeal:

Question: I'll direct your attention to February 10, 1996, and for purposes of refreshing your recollection I'm going to direct your attention to an activity log for that day, which appears to be the activity log of you and Chris Hatcher, is that correct? Is that a yes?

Answer: Yes.

Q: Would you go to the second page, please? And for the entry time beginning 10:30, and the activity lasting until 2:30, there's a narrative, a short narrative about activity at 14245 Bentler, is that correct?

A: Yes.

Q: Tell the Grand Jury what you recall about it.

A: We had received a run, well, not we, Scout 6–9 had received a run. I was working Scout 6–1, we had backed them up at that particular run. When we got to the run, pulled in front of the house, we exited the vehicle.

Q: Stop right there. What was the nature of the run, why did you go there, what information did you have?

A: I'll have to look at this. Here it says a person with a weapon, possible rape. It came out as a CSC, somebody held a person against their will.

Q: Do you have a present recollection of that, that that was the nature of the run?

A: Yes.

Q: Criminal sexual conduct, person held against their will?

A: Yes.

Q: Something like that?

A: Yes, something of that nature, yes.

. . .

Q: You were looking for a woman inside, were you not?

A: Yes, that was the first initial, you know, because of the nature of the run, yes.

Q: Was there a woman inside?

A: No.

Q: Once it was found there was no woman inside, why did the investigation continue?

A: That's hard to answer. I guess they had made a determination that this was possibly a dope house.

Q: Well, who made that determination that it was possibly a dope house?

A: That I can't say, I don't know.

Q: Well, let's see if we understand this correctly. *You went there under the belief that there was somebody that was a victim of a CSC rape, possibly being held hostage, so entry was made?*

A: *Right.*

. . .

Q: Did you have probable cause to search that house?

A: Yes, yes.

Q: What was your probable cause?

A: Because of the nature of the run. And due to the nature of the run that—

Q (interposing): Well, the nature of the run dealt with a CSC, right?

A: Yes.

Q: So, you were searching for evidence of rape, is that what you're saying?

A: Well. From what I can recall—and then I would have to refer to this.

Q: Go ahead.

A: There was a gun involved. You know, persons with a weapon and a possible rape. So, you know, due to that, that was the probable cause, as far as to search the house.

Q: Probable cause to search for what?

A: For weapons, contraband.

A month after Radford gave this testimony, the FBI and Assistant United States Attorney learned from officer Hatcher that the probable cause on which the officers relied in entering the house had been fabricated. When confronted with the new information, Radford admitted that the 911 run was bogus but maintained that he did not know of the fabrication until Hatcher told him several days later. The FBI doubted the story, and Radford finally admitted that the officers had met at the Sixth Precinct before going out on patrol and talked about the house they wanted to "hit." The four officers met again on the street, and Owens and Redd talked about the dope house on Bentler. Owens and Redd drove away from the rendezvous, leaving Radford with the impression that they were going to make the 911 call. After Owens and Redd departed, Radford heard the call go out over the 911 dispatch line and heard Owens and Redd take the call, at which point Radford and Hatcher responded over the radio that they would serve as backup. Transmissions between the officers' squad cars reveal that after dispatch issued the rape report, they arranged a second meeting about a block away from the Bentler address.

A subsequent grand jury handed up a Second Superseding Indictment, charging Radford with conspiracy to violate civil rights, in violation of 18 U.S.C. § 241, and two separate counts of making false declarations before a grand jury, in violation of 18 U.S.C. § 1623(a). Following a trial, a jury acquitted Radford of the conspiracy charge and one of the false declarations charges, but convicted him of making false declarations in the passage quoted above. After the verdict was delivered, Radford filed a FED. R. CRIM. P. 29(c) motion, renewing his previous motions for judgment of acquittal, arguing that the evidence at trial did not support the conclusion that he did not believe he had probable cause at the time of the run and that the jury's verdict was internally inconsistent. The district court denied the motion. Accepting the presentence report's recommendations of offense level 12 and Criminal History Category I, the district court sentenced Radford to five months of imprisonment at a Community Confinement Center and five months of home confinement, followed by two years of supervised release. Radford timely appealed.

▮ This court reviews de novo a district court's refusal to grant a motion for judgment of acquittal. *See United States v. Keeton*, 101 F.3d 48, 52 (6th Cir.1996); *United States v. Gibson*, 896 F.2d 206, 209 (6th Cir.1990). We must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). A perjury charge pursuant to 18 U.S.C. § 1623 has three elements: 1) the defendant testified before a federal court or grand jury; 2) he made false material statements, as detailed in

the indictment, during such testimony; and 3) he knew the statements were false when he made them. "In order to sustain a perjury conviction, the questions and answers which support the conviction must demonstrate both that the defendant was fully aware of the actual meaning behind the examiner's questions and that the defendant knew his answers were not the truth." *United States v. Eddy*, 737 F.2d 564, 567 (6th Cir.1984).

█ Radford now raises an argument slightly different than that which he advanced below.[2] He has always claimed that his statements were not false, arguing below that he *believed* he had probable cause to search 14245 Bentler at the time of the search although he later realized that the 911 call had been bogus. He now argues that one of the statements he made (underscored in the above quotation) was an "equivocal response to an ambiguously compound question that is subject to various interpretations," implying that he gave a literally true answer to one of the "various interpretations" of the question. He cites *Bronston v. United States*, 409 U.S. 352, 362, 93 S.Ct. 595, 34 L.Ed.2d 568 (1979), for the proposition that "[p]recise questioning is imperative as a predicate for the offense of perjury," and *Eddy*, 737 F.2d at 567, for the proposition that "[v]ague and ambiguous questions are not acceptable."

In *Bronston*, the Court held that a witness may not be convicted of "perjury for an answer, under oath, that is *literally true but not responsive* to the question asked and arguably misleading by negative implication." *Bronston*, 409 U.S. at 353, 93 S.Ct. 595 (emphasis added). At a hearing to determine the location of certain assets connected with the defendant's company, the following exchange between Bronston and a lawyer occurred:

Q. Do you have any bank accounts in Swiss banks, Mr. Bronston?

A. No, sir.

Q. Have you ever?

A. The company had an account there for six months, in Zurich.

Q. Have you any nominees who have bank accounts in Swiss banks?

A. No, sir.

Q. Have you ever?

A. No, sir.

As a matter of later proven fact, Bronston once had a personal Swiss bank account but did not have one at the time of his testimony. Bronston was convicted of perjury based on the government's theory that he had answered the second question with "literal truthfulness but unresponsively addressed his answer to [his] company's assets and not to his own—thereby implying that he had no personal Swiss bank account at the relevant time." *Id.* at 355, 93 S.Ct. 595. Acknowledging that Bronston's testimony was not responsive, the Supreme Court dismissed the contention that the perjury statute could be broadly construed to apply to a situation where a witness makes "affirmative statements of one fact that in context constituted denials by negative implication of a related fact." *Id.* at 361, 93 S.Ct. 595. When a witness initially avoids a direct or responsive an-

---

**2.** In part because the government has not objected to Radford's argument on the ground that it was not first presented to the district court and because the question is a purely legal one fully briefed by both parties, we exercise our discretion to consider his contention for the first time on appeal. *See United States v. Hayes*, 218 F.3d 615, 619 (6th Cir.2000); *United States v. Chesney*, 86 F.3d 564, 567–68 (6th Cir.1996). This court has previously assumed that plain error review will apply in circumstances such as these, *see Hayes*, 218 F.3d at 622, but we need not finally resolve that issue today because, as explained in the text, we detect no error at all in the district court's denial of Radford's motions for judgment of acquittal.

swer to an examiner's questions, it is the questioner's burden "to pin the witness down to the specific object" of his inquiry. *Id.* at 360, 93 S.Ct. 595. It is the "lawyer's responsibility to recognize [evasive testimony] and to bring the witness back to the mark, to flush out the whole truth with the tools of adversary examination." *Id.* at 359, 93 S.Ct. 595. Since Bronston's statements under oath were all literally true, he was entitled to judgment of acquittal.

On appeal, the parties focus their arguments on Radford's affirmative response to the prosecutor's question, "You went there under the belief that there was somebody that was a victim of a CSC rape, possibly being held hostage, so entry was made?"[3] In Radford's view, the question assumes that he went to Bentler under the belief that a rape was in progress, "but it actually asks him if entry was made into the house." Def. Br. at 13. Radford submits that entry into the house did not depend upon the "assumption," so his affirmative answer could have reflected agreement with not the assumption (going to the house under the belief that a rape was in progress) but with the attendant query (whether someone entered the house). He argues that his "answer does not unequivocally manifest an adoption of the assumption that he believed the run was for a rape in progress." The government reads Radford's testimony as acknowledging 1) that he went to Bentler believing, in reliance on the report, that a rape was in progress and 2) that this belief in the existence of probable cause was the reason he and the others made entry into the house. The government explains the prosecutor's difficult syntax by submitting that the word "so" denoted a causal relationship: the prosecutor asked whether Radford entered (the effect) as a result of his belief that a rape was in progress (the cause).

Upon review of the grand jury transcript, we find several additional grammatical theories to explain the relationship between the first and second parts of the prosecutor's question to Radford. The question obviously presumes some sort of relationship between the two events (going to the Bentler address believing a rape was in progress and entering the house), but the relationship could be causal, dependent, or merely temporal. Radford's theory—that the question's structure denotes no relationship but is merely compound—is unpersuasive, to say nothing of his contention that his unreserved affirmative response should be interpreted, *as a matter of law,* as adopting only the half of the question that, conveniently, states the agreed-upon truth that the police entered the house. "[T]he [g]overnment is entitled to present, and the jury to consider, evidence of the context of the questioning which would establish that the [d]efendant ... knew exactly what the questions meant ...." *United States v. DeZarn,* 157 F.3d 1042, 1049 (6th Cir.1998). The most reasonable reading of the prosecutor's query is that it asks whether he went to Bentler "under the belief that there was somebody that was a victim of a CSC rape" and that he made warrantless entry into the house as a consequence of this belief.

Radford's argument presupposes that a defendant may rely on *Bronston* to attack a perjury conviction by parsing the language of allegedly perjurious testimony to

---

**3.** Although the government joins the battle over interpreting the "... so entry was made" question, it also points to other statements detailed in the indictment to sustain the conviction: "Q: You were looking for a woman inside, were you not? A: Yes, that was the first initial, you know, because of the nature of the run, yes." and "Q: Did you have probable cause to search that house? A: Yes, yes." Because we find no merit in Radford's contentions, we decline to address the government's alternative grounds.

come up with a grammatical theory that avoids the consequences of testimony that a jury found was intentionally false. Witnesses do not often pause in the middle of courtroom examinations to consult Strunk & White's *Elements of Style* before answering questions. More importantly, we see absolutely no value in creating a rule that would encourage them to do so. As we held in *DeZarn*, juries who have just sat through trials are perfectly capable of hearing arguments by both sides regarding the meaning of questions posed and answers given in a prior proceeding. Their factual findings beyond a reasonable doubt resolve not only the intentional misrepresentation issue but, in cases such as this, the matter of certain testimony's meaning. Courts will only disturb that verdict when no rational trier of fact could have found as they did. *See Jackson v. Virginia*, 443 U.S. at 319, 99 S.Ct. 2781. Nothing in *Bronston* requires appellate courts to do more.

The competing grammatical theories of the question's meaning show that a rational trier of fact could have reached several conclusions as to the substance of Radford's testimony, the most reasonable of which supports the government's theory of the crime. The jury had before it ample evidence, in the form of the FBI agent's testimony regarding Radford's admissions during the interview and the circumstances surrounding Radford's response to the dispatcher's rape-in-progress call, to support the conclusion that Radford's testimony affirming his belief that the rape report provided probable cause to support the search was false. *See United States v. Camporeale*, 515 F.2d 184, 189 (2d Cir. 1975). Unlike the defendant's testimony in *Bronston*, Radford's testimony was not literally true though misleading by negative implication. It was literally false.

The reasoning of *Bronston* and the holdings of several courts of appeals subsequent to *Bronston* provide further support for our conclusion that Radford was not entitled to a judgment of acquittal. In *Bronston*, the Supreme Court observed that any problems created by the supposed negative implication of a literally true but unresponsive answer were best solved by the questioner's further probing the witness rather than by a federal perjury prosecution: "If a witness evades, it is the lawyer's responsibility to recognize the evasion and bring the witness back to the mark, to flush out the whole truth with the tools of adversary examination." *Bronston*, 409 U.S. at 358–59, 93 S.Ct. 595. From the Court's reasoning, this circuit and others have concluded that, when a witness gives an unequivocal and objectively responsive answer, a charge of perjury may not be dismissed no matter what secret meaning the witness may have harbored. *See DeZarn*, 157 F.3d at 1048 ("Where ... the answer given is responsive to the question asked and 'it is entirely reasonable to expect a defendant to have understood the terms used in the question,' a charge of perjury may not be dismissed for insufficiency." (quoting *United States v. Slawik*, 548 F.2d 75, 86 (3d Cir.1977)); *see also United States v. Schafrick*, 871 F.2d 300, 303 (2d Cir.1989); *United States v. Lane*, 735 F.2d 799 (5th Cir.1984)). Radford's response to the question was both unequivocal and responsive. The issue of the answer's falsehood properly went to the jury.

The jury concluded that Radford did not in fact believe that a rape was in progress at 14245 Bentler on the occasion he made a warrantless entry into that house. Radford testified to the contrary before a federal grand jury. He is guilty of perjury. We AFFIRM the judgment of conviction and sentence.