*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2000 FED App. 0072P (6th Cir.)
File Name:  00a0072p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellant,*

*v.*

No. 98-6179



ALTON RAY MILLS and
STEPHEN D. TOARMINA,
*Defendants-Appellees.*

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 96-20080—Jerome Turner, District Judge.

Argued:  December 16, 1999

Decided and Filed:  February 28, 2000

Before:  NELSON and DAUGHTREY, Circuit Judges;
DOWD, District Judge.

---

*The Honorable David D. Dowd, Jr., United States District Judge for the Northern District of Ohio, sitting by designation.

————————————

**COUNSEL**

**ARGUED:**    Dan L. Newsom, ASSISTANT UNITED STATES ATTORNEY, SENIOR LITIGATION COUNSEL, Memphis, Tennessee, for Appellant.   A. C. Wharton, Jr., WHARTON, WHARTON & ASSOCIATES, Memphis, Tennessee, James R. Garts, Jr., HARRIS, SHELTON, DUNLAP & COBB, Memphis, Tennessee, for Appellees. **ON BRIEF:**    Dan L. Newsom, ASSISTANT UNITED STATES ATTORNEY, SENIOR LITIGATION COUNSEL, Memphis, Tennessee, for Appellant.   A. C. Wharton, Jr., WHARTON, WHARTON & ASSOCIATES, Memphis, Tennessee, James D. Causey, CAUSEY, CAYWOOD, TAYLOR, MCMANUS & BAILEY, Memphis, Tennessee, James R. Garts, Jr., James D. Wilson, HARRIS, SHELTON, DUNLAP & COBB, Memphis, Tennessee, for Appellees.

————————————

**OPINION**

————————————

DAVID A. NELSON, Circuit Judge.  This is an appeal by the government from a judgment of acquittal on certain Hobbs Act charges and related conspiracy and money laundering counts of which a jury had found the defendants guilty.  The question presented is whether the defendants' conduct  –  conduct that involved the solicitation and acceptance of bribes for appointments to deputy sheriff positions in Shelby County, Tennessee – affected interstate commerce, thereby giving rise to federal jurisdiction under the Hobbs Act.  Because one or more of the conspirators involved in the solicitation of the bribes had actual knowledge that the bribe money would be obtained through loans made in interstate commerce, we answer this question in the affirmative.  The judgment of acquittal will be reversed.

# I

Defendant Alton Ray Mills was the Chief Deputy Sheriff of the Shelby County Sheriff's Department. Defendant Stephen D. Toarmina held the title of Staff Special Deputy in the Department. During the early 1990s, defendant Toarmina or an intermediary approached a number of young men with offers to see that "the man downtown" – who proved to be defendant Mills – would appoint them as full-time deputy sheriffs in exchange for the payment of bribes of approximately $3,500 for each position. Six of the young men accepted this deal, paid the bribes, and were subsequently hired by Mills.

All six of the aspiring deputy sheriffs were in their early 20s, and none had cash resources adequate to pay the sums demanded. Defendant Toarmina or one of his co-conspirators encouraged each of the young men to borrow the money from a Memphis loan company – First Metropolitan Financial Services, Inc. – with which Toarmina had an ongoing relationship. It is undisputed that the business of First Metropolitan was interstate in character.

Five of the six young men accepted Toarmina's suggestion, signing First Metropolitan loan forms on which Toarmina was listed as "source" or "reference." First Metropolitan approved all five of the loan applications, notwithstanding that some of the applicants had negative credit references, and Toarmina personally co-signed at least one of the notes. The sixth individual, Derick Feathers, elected not to do business with First Metropolitan; he raised the bribe money by taking advances on his credit cards.

All of the funds in question were turned over to Toarmina, who deposited the money in the bank account of a commercial enterprise called the Toarmina Grocery and Market. The assets of the grocery business were subsequently used by Messrs. Toarmina and Mills to satisfy personal obligations.

In April of 1996 a federal grand jury handed up an 18-count indictment charging Toarmina and Mills with a variety of offenses.  Count 1 charged the two officials with conspiracy between themselves and with other persons (known and unknown to the grand jury) to commit crimes that included affecting interstate commerce by extortion in violation of the Hobbs Act, 18 U.S.C. § 1951.  The original indictment did not give the names of the unindicted co-conspirators known to the grand jury, but these names  –  which included the names of the six young men referred to above  –  were later set forth in a bill of particulars.  Other counts of the indictment charged the defendants with soliciting and accepting bribes in violation of 18 U.S.C. § 666, with specified extortionate acts violating the Hobbs Act, and with money laundering in violation of 18 U.S.C. § 1956(a).

The district court granted a pre-trial motion to dismiss the bribery counts on the ground that the transactions at issue did not meet the $5,000 threshold specified in 18 U.S.C. § 666.  The government took an interlocutory appeal, and in *United States v. Mills*, 140 F.3d 630 (6th Cir. 1998), this court affirmed the dismissal of the bribery counts.  The case subsequently went to trial on the counts that remained.

Pursuant to Rule 29, Fed. R. Crim. P., the defendants moved for a judgment of acquittal.  The district court allowed the case to go to the jury, but informed the parties outside the presence of the jury that the motion would be granted with respect to the counts at issue here.  The jury returned verdicts of guilty on all counts, and, for reasons explained by the district court on the record, the court followed through on its earlier promise to grant acquittals.  The government has perfected a timely appeal.

## II

The Hobbs Act provides, in relevant part, that

"Whoever in any way or degree obstructs, delays, or affects commerce . . . by robbery or extortion or attempts or conspires so to do . . . shall be fined under this title or

Feathers advised that he did not have the money.  He advised that he could get some cash advances on his credit cards, which he did."

It is true that the borrowing of the money from interstate lenders could not have been expected to "interfere" with interstate commerce.  We are satisfied, however, that the effect on commerce need not be adverse; even a beneficial effect can satisfy the statute. See *Mattson*, 671 F.2d at 1024.  In exercising its constitutional power to regulate commerce among the several states, Congress often prohibits conduct that would have a stimulative effect on commerce as opposed to a depressive effect.  And the Hobbs Act applies wherever extortion "in *any* way or degree . . . affects commerce . . . ." (Emphasis supplied.)

The judgment of acquittal is **REVERSED**, and the case is **REMANDED** for the entry of judgment in accordance with the jury's verdict.

The government apparently argued that resort to company assets was not in fact unlikely, most of Mr. Allen's personal assets having been illiquid. The Fourth Circuit was not impressed by this argument, pointing out that Allen had easy access to certificates of deposit. "[E]ven aside from these assets," the court added, "we rely on the fact that, when pressed at oral argument, the government could offer no convincing explanations as to why Allen could not easily secure a loan against his ample non-liquid assets." *Id.* The Fourth Circuit's opinion contains no discussion of whether such a loan would itself have been likely to affect interstate commerce.

In the case at bar, advancing an argument of a sort apparently not made in *Mattson* or *Buffey*, the government contends that the requisite effect on interstate commerce has been demonstrated here because the proofs showed a realistic probability that the bribe money would be borrowed from a company engaged in interstate commerce. We find the government's argument persuasive, especially in view of the existence of substantial evidence that defendant Toarmina or one of his co-conspirators had actual knowledge of the interstate character of the funds before the money was turned over.

It is clear that unlike Mr. Allen in the *Buffey* case, the aspiring deputy sheriffs from whom the defendants in this case solicited bribes were not wealthy men. It was virtually certain that each of them would have to go into debt to raise the bribe money. With respect to the five young men who borrowed the bribe money from First Metropolitan (at annual percentage interest rates exceeding 30%), moreover, it is clear that defendant Toarmina or one of the co-conspirators who did the soliciting on his behalf had actual knowledge of the source of the funds. The sixth young man, Derick Feathers, found First Metropolitan's interest rate too high, so he borrowed the money on his credit cards. There was uncontradicted testimony from the member of the conspiracy who solicited the bribe from Feathers that the conspirator knew this was where the money was coming from: "Mr.

imprisoned not more than twenty years, or both." 18 U.S.C. § 1951(a).

As used in this section, "commerce" is defined in terms that include all commerce between any point within a state and any point outside the state, as well as "all other commerce over which the United States has jurisdiction." 18 U.S.C. § 1951(b)(3).

The Supreme Court has made it clear that the Hobbs Act's broad jurisdictional language is to be read as meaning what it says:

> "[The] Act speaks in broad language, manifesting a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence. The Act outlaws such interference 'in any way or degree.' 18 U.S.C. § 1951(a)." *Stirone v. United States*, 361 U.S. 212, 215 (1960).

The maxim "*de minimis non curat lex*" does not apply in determining whether an effect on commerce is sufficient to satisfy the jurisdictional predicate of the Hobbs Act. It has long been the understanding in this circuit that even a "*de minimis*" effect on interstate commerce will suffice. See *United States v. Peete*, 919 F.2d 1168, 1174 (6th Cir. 1990) (citing cases). Both in our circuit and others, this understanding has survived the opinion in *United States v. Lopez*, 514 U.S. 549 (1995), a case dealing with the constitutionality of a statute that did not address interstate commerce at all. See *United States v. Smith*, 182 F.3d 452, 456 (6th Cir. 1999), where we joined "[a]ll of the other circuits that have considered the issue [in holding] that the *de minimis* standard for Hobbs Act charges survived *Lopez* . . . ."

The government argues here, as it did before the district court, that the requisite effect on commerce was shown by (among other things) proof that there was from the outset a reasonable probability that the would-be deputy sheriffs – none of whom seems to have had any appreciable savings –

would borrow the bribe money from the loan company recommended by defendant Toarmina or from some other interstate lender, such as a credit card company. In rejecting this argument, the district court relied primarily on two pre-*Lopez* opinions from other circuits, *United States v. Mattson,* 671 F.2d 1020 (7th Cir. 1982), and *United States v. Buffey,* 899 F.2d 1402 (4th Cir. 1990). We are not persuaded that either of these opinions should control the decision here.

*Mattson* involved a $3,000 bribe paid by one Donald Anderson, a Playboy Club electrician, to secure a supervising electrician's license from the City of Chicago. Although Anderson financed part of the bribe by taking out a personal loan, the Seventh Circuit's opinion gives no indication that the government tried to hang its hat on this peg in maintaining that the evidence established the necessary nexus to interstate commerce.

The Seventh Circuit acknowledged in *Mattson* that either a direct effect on commerce or an indirect effect would supply the requisite nexus. The court found no evidence of either type of effect, however, in the record before it.

First, the Seventh Circuit said,

"There was no possibility of a direct effect on interstate commerce, because Anderson's payment of $3,000 for an electrician's license neither actually nor potentially affected the purchase of electrical supplies from outside Illinois for use in electrical repairs in the Playboy Building. Whether Playboy's own staff did the work, or Commercial Lighting was hired, the supplies would still have to be purchased outside Illinois by Playboy or Commercial Lighting. Neither of these enterprises were victims of the extortion." *Id*. at 1024.

Second, said the court, while the indirect effect represented by depletion of the assets of an interstate business can be jurisdictionally sufficient, there was no such depletion of assets in *Mattson*:

"In the case before us, it was only Anderson's personal assets which were depleted by the $3,000 payment: The record clearly established that Playboy never reimbursed Anderson for the extorted sum. We would have a different case if Playboy, a business, had been the victim of the extortion instead of Anderson. But Anderson himself certainly was not conducting a business engaged in, or purchasing items from, interstate commerce. The victim in this case was an individual who had no connection with interstate commerce at all . . . ." *Id*. at 1024-25.

The Seventh Circuit seems to have given no consideration to the possibility that Anderson's borrowing of a portion of the money used for the bribe might have given him a connection with interstate commerce.

The second opinion relied on by the district court, the Fourth Circuit's opinion in *Buffey*, involved an attempt to blackmail one James Allen, a wealthy businessman who had been guilty of a sexual indiscretion. The defendants conspired to demand $20,000 for keeping quiet about Allen's peccadillo, and the main question before the court was whether the indirect effect/"depletion of assets" theory could legitimately be applied to satisfy the Hobbs Act's jurisdictional prerequisite. ("[T]he government must concede," the court said, "[that] the acts [the defendants] conspired to commit would not have affected interstate commerce directly." *Buffey*, 899 F.2d at 1404.)

The company of which Mr. Allen was board chairman and majority stockholder was engaged in interstate commerce, and the *Buffey* court indicated that it would have recognized the existence of the required nexus with commerce had it been reasonably probable that Allen would dip into corporate funds in order to pay the blackmailers. Because of his wealth, however, the Fourth Circuit concluded that it was "highly unlikely that Allen would have satisfied an extortion demand by means of the Company's assets rather than his personal assets." *Id*. at 1405.