*7RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0372P (6th Cir.)
File Name: 00a0372p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

—————————

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee,*

    *v.*

LAWRENCE RAY
CARMICHAEL,
    *Defendant-Appellant.*

No. 99-5179

Appeal from the United States District Court
for the Eastern District of Kentucky at London.
No. 98-00076—Karl S. Forester, District Judge.

Argued: June 20, 2000

Decided and Filed: October 20, 2000

Before: KEITH, DAUGHTREY, and GILMAN, Circuit
Judges.

—————————

## COUNSEL

**ARGUED:** Joseph R. Lane, PILLERSDORF, DeROSSETT
& BARRETT, Prestonsburg, Kentucky, for Appellant.
Charles P. Wisdom, Jr., ASSISTANT UNITED STATES
ATTORNEY, Lexington, Kentucky, for Appellee.
**ON BRIEF:** Joseph R. Lane, Ned B. Pillersdorf,

1

PILLERSDORF, DeROSSETT & BARRETT, Prestonsburg, Kentucky, for Appellant.    Charles P. Wisdom, Jr., ASSISTANT UNITED STATES ATTORNEY, Lexington, Kentucky, Edwin J. Walbourn III, UNITED STATES ATTORNEY, Covington, Kentucky, for Appellee.

GILMAN, J., delivered the opinion of the court, in which DAUGHTREY, J., joined.  KEITH, J. (pp. 21-30), delivered a separate dissenting opinion.

————————————

## OPINION

————————————

RONALD LEE GILMAN, Circuit Judge.  Lawrence Ray Carmichael, formerly a Commonwealth attorney for three counties in eastern Kentucky, was convicted of extorting money from a local bookmaker in violation of the Hobbs Act, 18 U.S.C. § 1951.  He was sentenced to twenty-seven months of incarceration and two years of supervised release.  For the reasons set forth below, we **AFFIRM** Carmichael's conviction.

## I.  BACKGROUND

In late November or early December of 1997, a man named Rodney Adams was charged with wanton endangerment or assault (the record is not clear on this point) in Kentucky state court in one of the counties within Carmichael's jurisdiction. Adams owned a pawn shop and commercial rental property in Somerset, Kentucky.  He also ran a thriving (and illegal) bookmaking operation and poker game out of his pawn shop. Adams's bookmaking operation, in which he handled bets for players from Kentucky, Tennessee, and Alabama, grossed up to $400,000 per week, and resulted in net profits of up to $150,000 per week.  He also had a criminal record consisting of a 1979 conviction for robbery and a 1989 conviction for cocaine possession.

sacred oath. Consistent with the reasons stated above, I vehemently dissent.

Adams, worried about being indicted as a result of the 1997 criminal charge, directed his attorney, Mark Knight, to telephone Carmichael. As a Commonwealth attorney, Carmichael was responsible for prosecuting individuals who are charged with felonies. Carmichael told Knight that the county attorney could handle the matter. Because county attorneys in Kentucky prosecute persons accused of misdemeanors, but not felonies, the obvious implication of this statement was that Carmichael was not interested in prosecuting the offense as a felony. Carmichael, however, could have charged Adams with a felony for the offense in question.

During the conversation, Carmichael asked Knight if Adams would be willing to donate several hundred dollars to pay for Christmas decorations in Carmichael's office. (Carmichael was not allowed to use state funds for the decorations.) Knight relayed the request to Adams, who agreed to pay on the basis that Carmichael was the highest-ranking law enforcement officer in the county and that it would be foolish to "make him mad for $500." Carmichael knew about Adams's illegal gambling business and Adams knew that Carmichael had the power to shut it down and have Adams arrested. Under the circumstances, Adams thought it would have been "very stupid" not to pay Carmichael.

Knight asked Carmichael for purchase receipts and Carmichael obliged, giving Knight receipts acknowledging the payment for Christmas decorations of more than $500. Adams reimbursed Carmichael, although the amount was more than he had expected. The county attorney's office subsequently agreed to dismiss the pending charges against Adams after the passage of sixty days. At the end of the sixty days, the charges were dismissed with prejudice.

In January of 1998, Carmichael asked Adams to assist him in the investigation of an individual named Jerry McKinney. The precise nature of this investigation cannot readily be ascertained from the record, although it apparently related to homemade sex videos that involved prominent individuals.

Adams agreed, and Carmichael arranged for Adams to meet with Kentucky State Police Detective David Mirus.

At the first meeting between Adams and Det. Mirus, Carmichael introduced Adams as "a bookie," although Carmichael said he was not interested in prosecuting Adams. Carmichael promised Adams that his name would not be used in the investigation. At this point, Carmichael had already acquired one of McKinney's sex videos, and Adams promised Carmichael that he would be able to obtain a second. After he had discussed the investigation of McKinney with Adams, Det. Mirus learned that Adams's name had come up in an ongoing drug investigation, although it was later determined that the allegations regarding Adams's involvement were "unfounded."

On March 19, 1998, Carmichael told Knight that he had "received word" that Adams was interested in making a very large campaign donation. Carmichael also told Knight that Adams's name had come up in the course of a federal investigation and that he knew that Adams had "been wiring large sums of money, cash from a truck stop in the Somerset area." During the conversation, Carmichael added that he had "lived up to his end of the deal on the McKinney matter, that Rodney's name had been kept secret, had not been used, [and] had not been made public." Finally, Carmichael said that Adams "had stepped on some of the toes of the Feds in [the] McKinney investigation." Carmichael suggested that Knight ask his client for $100,000 in cash, which would go into a slush fund of Carmichael's creation to be spent on political campaigns of Carmichael's choice. The request, Carmichael told Knight, was based on the reasoning that if Knight asked for $100,000, Adams might be inclined to give $50,000.

On March 21, 1998, Knight reported to Adams that Carmichael had requested $100,000 from him "to distribute for campaign funds," but hoped to get $40,000 or $50,000. Knight repeated to Adams what Carmichael had said about Adams's name "coming up" in the course of an ongoing federal investigation. Adams "freaked out" at this news, and

respond. These communications thereby can create both the appearance of impropriety and the possibility of actual misconduct. Even where the government acts in good faith and diligently attempts to present information fairly during an *ex parte* proceeding, the government's information is likely to be less reliable and the court's ultimate findings less accurate than if the defendant had been permitted to participate. However impartial a prosecutor may mean to be, he is an advocate, accustomed to stating only one side of the case. An *ex parte* proceeding places a substantial burden upon a trial judge to perform what is naturally and properly a function of an advocate.

*United States v. Napue*, 834 F.2d 1311, 1318-19 (7th Cir. 1988) (citations omitted); *accord*, *In re Taylor*, 567 F.2d 1183 (2d Cir. 1977); *Haller*, 409 F.2d at 859-60. Moreover, *ex parte* communications, such as that below, violate ethical guidelines. Canon 3(A)(4) of the American Bar Association Code of Judicial Conduct states that "[a] judge should...neither initiate nor consider *ex parte* or other communications concerning a pending or impending proceedings." Further, Canon 2(A) provides that "[a] judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." The protection afforded criminal defendants from *ex parte* communications between the district court and the prosecutor is "not merely a matter of ethics; it is part of a defendant's right to due process and effective representation." *Haller*, 409 F.2d at 861.

Our criminal judicial system is premised upon certain fundamental rights – the right to effective assistance of counsel, the right to an impartial judge and jury, the right to the presumption of innocence, the right to due process. The majority opinion vitiates each of these basic guarantees. As judges of this Court we have sworn to serve as protectors of the United States Constitution. The majority desecrates that

Defendant his right to effective assistance of counsel.[3] Allowing the government unfettered access to the court's ear undermines the adversarial process and taints the appearance of judicial impartiality. The district court's ruling on the *Brady* material "may well have been due not only to the fact that the prosecutor got in his pitch first, but, even more insidiously, to the very relationship, innocent as it may have been thought to be, that permitted such disclosures." *Haller*, 409 F.2d at 859-60. Since the government has not met its substantial burden of proving lack of prejudice to Carmichael, and has failed to demonstrate a compelling state interest, this *ex parte* communication does not fall within the narrow exceptions outlined in *Minsky*.

An *ex parte* communication between the government's counsel and the trial court denies the defendant his right to due process and effective representation. Further, this Court considers an *ex parte* conference a "gross breach of the appearance of justice" that deprives a defendant of his right to an impartial jurist and perverts the adversarial process. *Minsky*, 963 F.2d at 874 (quoting *Haller*, 409 F.2d at 859). Recognizing the import of this issue, other circuits have emphasized the dangers of allowing *ex parte* proceedings in criminal cases.

> *Ex parte* communications between the government and the court deprive the defendant of notice of the precise content of the communications and an opportunity to

---

[3] The majority opinion concludes that there is "no basis to believe that the document in fact would have been of any value to Carmichael." In reaching this conclusion, the majority relies on the government's assertion that the documents were not of any value to Carmichael. However, Carmichael has presented evidence that the prosecutor made misleading statements to the trial court, undoubtedly to avoid an *in camera* review and potential relinquishment of the documents in its possession to Carmichael. The prosecutor's misstatements to the district court constitute "an indication of misconduct," thus eliminating the presumption of truth bestowed on the government by *Hernandez*, 31 F.3d at 361. Accordingly, the majority's reliance on the government's assurances is misplaced.

reported Carmichael's request to County Attorney Fred Niekirk and Det. Mirus in the belief that Carmichael was making an oblique threat that Adams would be prosecuted if he did not give Carmichael $40,000 or $50,000. Two days later, Carmichael summoned Adams to his office, explaining that he preferred not to talk on the telephone. As requested, Adams went to Carmichael's office, meeting with him in a conference room.

Carmichael said that he appreciated Adams's help and had kept Adams's name out of the McKinney investigation. He also told Adams that he had "an idea" that could help Adams, but wanted to be "very careful." According to Adams, the idea consisted of Adams delivering a manila envelope containing $50,000 in cash to Knight's office, where it would be picked up by Knight's secretary. The money was to be used to help several local officials, including the county sheriff and eventually Carmichael himself, secure re-election. Carmichael and Adams agreed to meet the next day. Adams then left Carmichael's office through the back door, as Carmichael had instructed.

The next day, Adams telephoned Carmichael and arranged to meet him at a Burger King restaurant. Adams had in hand $5,000 in bait money that had been provided by Det. Mirus. At the Burger King, Adams offered Carmichael the $5,000 and promised him that more money would be forthcoming. Carmichael opened his briefcase and Adams put the money inside. Adams suggested that some of his gambling associates were willing to contribute to Carmichael's slush fund because they "were not hurting nobody" and preferred that local law enforcement authorities let them gamble in peace. Carmichael replied, "I think we have an understanding."

Two days later, Carmichael called Adams to arrange a meeting at which Adams would make the next payment. The police planned to videotape this meeting, but the meeting was aborted because Carmichael discovered that the police were watching him. About an hour after Carmichael detected the

surveillance, Kentucky State Police Lieutenant Jerry Provence and Captain Larry Lewis interviewed Carmichael.

Carmichael insisted that he was trying to set Adams up, instead of the other way around. He claimed that a police officer had approached him and told him that Adams was interested in buying influence among local political officials, and was prepared to contribute substantial sums of money to various campaigns in order to carry out his plan. (The police officer that Carmichael identified as having told him this later denied having any such conversation with either Adams or Carmichael.)

Carmichael initially asserted that he told David Guffy, a detective under his command, that Adams was under investigation, and that he had dispatched Det. Guffy to Knight's office to pick up Adams's attempted payoff and then to take it home. At that point, Carmichael said, he and Det. Guffy would "figure out what to do with it next." Carmichael, however, subsequently admitted that he had only told Det. Guffy to pick up a package, and that he never told him that the package was supposed to contain bribe money that was evidence in an ongoing official-corruption investigation. In fact, no law enforcement officer (other than Carmichael and possibly Det. Guffy) knew anything about Carmichael's supposed investigation of Adams.

Carmichael was indicted and charged with two counts of extortion in violation of the Hobbs Act. Count I of the indictment pertained to the alleged extortion of $500 for Christmas decorations at Carmichael's office. Count II pertained to the alleged extortion of slush fund contributions. At the close of the government's case, Carmichael moved for a judgment of acquittal. The district court granted the motion as to Count I of the indictment, but denied the motion as to Count II. Carmichael was subsequently convicted on Count II by the jury, and then sentenced by the court to twenty-seven months of incarceration, to be followed by two years of supervised release.

a strong interest in protecting the details of its on-going drug investigation, this interest could have been protected through less intrusive measures. In fact, as noted by the majority, a simple representation by the government in open court that the material Defendant sought did not contain *Brady* material would have satisfied both *Minsky* and *Hernandez*, 31 F.3d 354, 361 (6th Cir. 1991). Oddly, while *Hernandez* allows the district court to rely on statements by prosecutors concerning the absence of *Brady* material in its possession, the government opted to engage in unnecessary and protracted *ex parte* discussions with the district court. The government, having elected to make representations beyond those deemed sufficient by *Hernandez*, was required to make its representations in open court. The government fails to state a sufficiently compelling reason for excluding Defendant from these discussions. Moreover, any state interest in *ex parte* discussions between the government and the trial court is outweighed by the resulting prejudice to Carmichael.

As stated previously, "the burden of proving lack of prejudice is on the [government], and it is a heavy one." *Minsky*, 963 F.2d at 874 (quoting *Haller*, 409 F.2d at 860). Carmichael argues that the conference was prejudicial and adversely affected his substantial rights because the government made misstatements during the *ex parte* communication that, if corrected, would have prompted the district court to review the documents *in camera*. Putting the veracity of Carmichael's assertions aside,[2] the failure of the district court to afford defense counsel an opportunity to hear and respond to the government's representations denied

---

[2] The majority asserts that "the dissent... argues that Carmichael's substantial rights were adversely affected 'because the government made misstatements during the *ex parte* communication that, if corrected, would have prompted the district court to review the documents *in camera*.'" This assertion is a distortion of the truth.

the government while excluding Defendant. Once an affinity between the district court and the government has been established, the district court's ability to serve as a neutral arbiter is suspect. This affinity perverts the adversarial process and creates an intolerable air of partiality. The Supreme Court found that a trial conducted before "a judge who [i]s not impartial" to be a "structural defect affecting the framework within which the trial proceeds." *Id*. at 309-10. In light of the foregoing, the majority's conclusion that the *ex parte* communications did not affect Carmichael's substantial rights offends traditional notions of fairness and opens the door for prosecutorial abuse.

Having concluded that Carmichael's claim is a "[p]lain error[]...affecting [his] substantial rights," Fed. R. Crim. Pro. 52(b), the analysis turns on whether this Court should exercise its discretion to correct the error. The Supreme Court has stated that "[t]he court of appeals should correct a plain forfeited error affecting substantial rights if the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *Olano*, (quoting *United States v. Atkinson*, 297 U.S. 157, 160 (1936)). In this matter, no genuine dispute exists as to whether the *ex parte* conference below compromised "the fairness, integrity, and public reputation of judicial proceedings." *Id*. Therefore, this Court has the authority, and indeed the duty, to review his claim.

Having found that Defendant objected to the *ex parte* proceeding, and also having found that the claim deserves correction under a "plain error" analysis, the sole question is whether the government has met its burden under *Minsky*. 963 F.2d at 874. Under *Minsky*, "[e]x parte proceedings 'can only be justified and allowed by compelling state interests.'" *Id*. Moreover, this Court can only "overlook" an *ex parte* communication if it is not prejudicial to the defendant. *Id*.

I conclude that the government has failed to present a compelling state interest to justify the *ex parte* communications. Although the government undoubtedly has

On appeal, Carmichael argues that (1) his alleged conduct lacked the requisite connection with interstate commerce to support a Hobbs Act conviction, (2) the prosecution may have withheld evidence that might have been used to impeach Adams, the government's star witness, (3) the evidence was insufficient to convict, (4) the district court improperly excluded the testimony of a prospective defense witness, and (5) the district court improperly instructed the jury.

## II. ANALYSIS

### A.  Connection with interstate commerce

The United States does not have the power under the Commerce Clause to outlaw purely intrastate crime. *See, e.g., United States v. Lopez*, 514 U.S. 549, 567 (1995) (refusing to "convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States"). Consequently, alleged criminal conduct must have some connection to interstate commerce in order to state an offense under the Hobbs Act.

The Hobbs Act's jurisdictional provision, however, is extremely broad. *See* 18 U.S.C. § 1951(b)(3) (providing that "commerce" for the purposes of the Hobbs Act includes "all . . . commerce over which the United States has jurisdiction"); *Stirone v. United States*, 361 U.S. 212, 215 (1960) ("[The Hobbs Act] speaks in broad language, manifesting a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence. The Act outlaws such interference 'in any way or degree.'") (citation omitted). As a result, even a very minimal connection to interstate commerce is sufficient to sustain a Hobbs Act charge. *See, e.g., United States v. Mills*, 204 F.3d 669, 671 (6th Cir. 2000) ("The maxim 'de minimis non curat lex' does not apply in determining whether an effect on commerce is sufficient to satisfy the jurisdictional predicate of the Hobbs Act. It has long been the understanding in this circuit that even a 'de minimis' effect on interstate commerce will suffice."); *see also United States v. Atcheson*, 94 F.3d 1237, 1243 (9th Cir. 1996) ("To establish

a de minimis effect on interstate commerce, the Government need not show that a defendant's acts actually affected interstate commerce. Rather, the jurisdictional element is satisfied by proof of a probable or potential impact.") (citation and internal quotation marks omitted).

This court recently concluded that a law enforcement officer's extortion of payments of $3,500 each in exchange for a job as a sheriff's deputy had the requisite connection to interstate commerce because there was a "realistic probability" that the prospective sheriffs' deputies, who were young and lacked significant financial assets, would turn to an interstate lender recommended by the defendant in order to come up with the money for the payments. *See Mills*, 204 F.3d at 672. *But cf. United States v. Min Nan Wang*, 222 F.3d 234 (6th Cir. 2000) (concluding that a residential robbery did not satisfy the jurisdictional element of the Hobbs Act).

Based on the evidence presented at Carmichael's trial, a reasonable jury could have concluded that Carmichael attempted to extort money from Adams in exchange for not cracking down on Adams's illegal poker and bookmaking operations, and that there was a realistic probability that some of the money would come from the proceeds of interstate gambling. We thus conclude that the government met its burden of showing the required connection to interstate commerce.

## B.   *Brady* **material/in camera review**

Carmichael argues that the district court abused its discretion by not reviewing in camera transcripts of Adams's wiretapped telephone conversations. Those conversations were obtained as part of a wiretapping operation pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968 at a time when the United States Attorney's Office suspected that Adams might be engaged in drug dealing. At trial, and now on appeal, the government asserts that the investigation failed to uncover any evidence that could have been used to impeach Adams, and that revealing the existence

"The first limitation is that the error in question must have occurred in the district court proceedings." *Id*. at 629; *accord*, *Olano*, 507 U.S. 725, 732 (1993). In *Thomas*, this Court held "that a deviation from a legal rule constitutes an error within the meaning of Rule 52(b) so long as the rule has not been waived by the defendant." 11 F.3d at 629. The Court noted "that the mere failure of a defendant to make a timely assertion of a right does not constitute a waiver, but rather, constitutes a forfeiture and that in those circumstances an error under Rule 52(b) is not extinguished." *Id*. Here, the *ex parte* communications were a deviation from a well-established legal rule which Carmichael did not waive. Therefore, Defendant has satisfied the first requirement.

"The second limitation on appellate authority under Rule 52(b) is that the error be 'plain.'" *Id*. at 630 (quoting *Olano*, 507 U.S. at 734). Because *ex parte* conferences are generally disallowed under the law of this Circuit, *see Minsky*, 963 F.2d at 874, the error is "plain."

"The third limitation on appellate authority under Rule 52(b) 'is that the plain error affect[s] substantial rights.'" *Thomas*, 11 F.3d at 630 (quoting *Olano*, 507 U.S. at 734). Generally, "the phrase 'affect substantial rights' means 'prejudicial' in the sense that the asserted error 'must have affected the outcome of the district court proceedings.'" *United States v. Hayes*, 218 U.S. 615, 622 (6th Cir. 2000) (quoting *Olano*, 507 U.S. at 734). However, the Supreme Court noted, and this Circuit recognized, that "[t]here may be a special category of forfeited errors that can be corrected regardless of their affect on the outcome" and "errors that should be presumed prejudicial if the defendant cannot make a specific showing of prejudice." *Olano*, 507 U.S. at 735; *see also Hayes*, 218 F.3d at 622. The Supreme Court listed as examples of these types of errors instances where "a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence..." *Arizona v. Fulminante*, 499 U.S. 279, 310 (1990). By allowing *ex parte* conferences before and during trial, the district court demonstrated a willingness to share intimate discourse with

During a discussion in open court regarding Carmichael's request for disclosure of *Jencks* and *Brady* material, the district court judge instructed both defense counsel and the government to approach the bench. The government then stated to the district judge that this discussion should be conducted "without them," i.e., without defense counsel. In response to defense counsel's suggestion that the trial court was the appropriate authority to determine the propriety of these discussions, the district court permitted the *ex parte* conference. After private discussions that constitute eight pages of transcripted record, the district court announced its satisfaction with the representations made by the government. In objecting to the district court's acceptance of the government's *ex parte* representations, defense counsel was assured by the district court that his concerns were "sufficient" for the record.

Despite defense counsel's clear dissatisfaction with the actions of the government and the district court, the majority concludes that "Carmichael's attorney did not object." Accordingly, the majority analyzes Carmichael's claim pursuant to Federal Rule of Criminal Procedure 52(b). However, a thorough reading of the record demonstrates an objection by Defendant rendering this analysis unnecessary. While maintaining that this analysis is unnecessary, I find Carmichael's claim meets the heightened scrutiny required by Rule 52(b).

Where a defendant fails to object during a federal criminal prosecution, Rule 52(b) vests appellate courts with the discretion to review these claims for plain error. The majority correctly states that this Court can hear Carmichael's claim regardless of whether it was raised in the district court. In *United States v. Thomas*, 11 F.3d 620, 629-30 (6th Cir. 1993), this Court outlined the requirements for appellate review for plain error. While "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court," Fed. R. Crim. Pro. 52(b), "[t]he Court of Appeals' power under Rule 52(b) is limited in three significant respects." *Id*.

of this wiretap (which was still ongoing at the time of Carmichael's trial) would have "blown" the investigation.

The government has long been under an obligation to disclose both exculpatory evidence and evidence that might tend to impeach the credibility of a key government witness. *See Giglio v. United States*, 405 U.S. 150 (1972); *Brady v. Maryland*, 373 U.S. 83 (1963). This court, however, has held that because prosecutors are officers of the court, district courts may take them at their word when they inform the court that they have reviewed specified sealed documents and that those documents do not contain material subject to compulsory disclosure under *Brady*. *See United States v. Hernandez*, 31 F.3d 354, 361 (6th Cir. 1994) (holding that, in the absence of "some indication of misconduct" by the government, the district court is not required to conduct an in camera review to verify the government's assertion).

Although we do not believe that it would be a satisfactory solution to force district judges to scrutinize large volumes of sealed materials whenever defense counsel request that they do so, we nevertheless have serious misgivings about the breadth of the rule announced in *Hernandez*. After all, it is difficult to conscientiously conclude that the government has met its obligations under *Brady* without seeing the materials that the government concededly did not disclose. Nevertheless, *Hernandez* is a published opinion and is the law of this circuit. *See Salmi v. Secretary of Health and Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985) (noting that a panel of this court "cannot overrule the decision of another panel" and that "[t]he prior decision remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision"). *Cf. United States v. Leung*, 40 F.3d 577, 582 (2d Cir. 1994) ("[I]n some circumstances the trial court should not rely on the Government's representations as to the materiality of potential impeachment evidence, but should instead undertake an independent in camera review of relevant Government files to determine materiality."). Counsel for the government has

represented unambiguously that all material that was then in its possession that might have been used to impeach Adams was disclosed.

During Carmichael's trial, counsel for the government twice asked, and received, permission from the court to approach the bench alone, in order to explain to the judge—out of the earshot of Carmichael and his attorney—what was on the wiretap recordings, and why none of it implicated Adams in drug dealing or other illegal activities. Despite the highly unusual nature of this request by counsel for the government, Carmichael's attorney did not object. Carmichael now argues that his Sixth Amendment rights were violated by these two ex parte discussions, and that this alleged violation, along with the district court's refusal to review the sealed transcripts that Carmichael suspected might contain *Brady* material, constitutes reversible error.

As a general rule of thumb, in all but the most exceptional circumstances, ex parte communications with the court are an extraordinarily bad idea. This court has not concealed its strong disapproval of ex parte approaches in criminal cases, reasoning that giving the government private access to the ear of the court is not only "a gross breach of the appearance of justice," but also a "dangerous procedure." *United States v. Minsky*, 963 F.2d 870, 874 (6th Cir. 1992) (citation omitted); *see also United States v. Earley*, 746 F.2d 412, 416 (8th Cir. 1984) (suggesting that ex parte communications should be strongly discouraged "[r]egardless of the propriety of the court's motives," because allowing ex parte approaches undermines confidence in the court's impartiality). Ex parte approaches "can only be justified and allowed by compelling state interests." *Minsky*, 963 F.2d at 874. Suffice it to say that the government bears the burden of demonstrating that the defendant was not prejudiced by an ex parte communication, and its burden is "a heavy one." *Id*. (citation omitted).

an effort to circumvent the teachings of *Minsky*.[1] I strongly object.

Initially, the majority correctly demonstrates this Court's strong preference to discourage *ex parte* conferences. The majority acknowledges that, "in all but the most exceptional circumstances, *ex parte* communications with the court are an extraordinarily bad idea." Furthermore, the majority notes that this Court has held that *ex parte* communications are "a gross breach of the appearance of justice." Finally, the majority recognizes that "the government's burden of demonstrating that the defendant was not prejudiced by an *ex parte* communication is 'a heavy one.'" After articulating this Court's profound distaste for *ex parte* communications and acknowledging the Court's jurisdiction to consider Carmichael's Sixth Amendment claim, the majority then engages in cursory analysis before summarily rejecting Carmichael's claims.

The proper analysis begins with a fair determination of whether a defendant objected to the *ex parte* communication. When a defendant objects contemporaneously to the *ex parte* communication, our analysis proceeds directly to a determination of whether the government has demonstrated a compelling state interest and lack of prejudice to the defendant. *See Minsky*, 963 F.2d at 874. After a careful review of the record, I find that Carmichael sufficiently preserved this issue for review by this Court.

---

[1] The majority mischaracterizes and dilutes the requirements of *Minsky*, concluding that the government need only "articulate" a "reasonable justification" for the *ex parte* conference. The majority manufactures its own "reasonable justification" standard, and substitutes this standard for the "compelling state interest" standard imposed by *Minsky*. These standards are legally distinct. The majority's invented standard improperly lowers the government's "heavy" burden to demonstrate a compelling state interest. Moreover, this standard is wholly unsupported by the law of this Circuit. I respectfully reject the majority's proposed standard.

prior statements made by the witnesses. *See id*. at 872. Specifically, Minsky requested Federal Bureau of Investigation forms containing the witnesses' statements, but the prosecution objected. *See id*. In resolving the situation, the district court held an *in camera* review of the forms, followed by a private conversation with the prosecution. *See id.* On appeal, Minsky challenged his conviction, arguing that the *ex parte* conference perverted his trial. *See id*. at 871.

Ultimately, Judge Timbers, speaking on behalf of this Court, held that the district court's *ex parte* conference with the prosecution was indeed grounds for reversal. *See id.* at 873-74. The Court did not soft-pedal the issue. Instead, it railed against the exclusion of a criminal defendant from proceedings crucial to his trial. The Court resolutely declared that "[t]he constitution requires that a defendant be represented at every critical stage of his trial." *Id.* at 874. The Court continued, "not only is it a gross breach of the appearance of justice when the defendant's principal adversary is given private access to the ear of the court, it is a dangerous procedure." *Id.* (quoting *Haller v. Robbins*, 409 F.2d 857, 859 (1st Cir. 1969)).

Indeed, it is a dangerous procedure. *Ex parte* conferences tear at the very heart of a defendant's fair trial and severely undermine confidence in our judicial process. As such, this Court only allows for *ex parte* conferences under the narrowest of circumstances. In *Minsky,* this Court noted that "[e]*x parte* proceedings 'can only be justified and allowed by compelling state interests.'" *Id*. at 874 (quoting *In re Taylor*, 567 F.2d 1183, 1188 (2d Cir. 1977)). The Court stated that "[a]lthough there are circumstances where an *ex parte* communication might be 'overlooked,' 'the burden of proving lack of prejudice is on the [government], and it is a heavy one.'" *Id*. (quoting *Haller*, 409 F.2d at 860). To my bewilderment, the majority distorts Sixth Circuit precedent in

In response to Carmichael's argument, the government first asserts that this court lacks jurisdiction to consider Carmichael's Sixth Amendment claim because he did not raise it in the district court. This assertion is incorrect and, as the government properly acknowledged in its post-hearing notice of supplemental authority, has been squarely rejected by this court. *See United States v. Hayes*, 218 F.3d 615, 619-20 (6th Cir. 2000) (explaining that although the courts of appeals ordinarily do not entertain arguments that were not advanced in the district court, the rule is one of prudence rather than one of jurisdiction).

On the other hand, the government is correct in pointing out the unfairness of allowing Carmichael to raise for the first time on appeal conduct that he acquiesced in below. *See United States v. Torres*, 199 F.3d 1324 (2d Cir. 1999) (unpublished table decision) (finding that the defendant had waived his right to be present at a sidebar when his attorney failed to contemporaneously object). Such acquiescence lulled the district court into believing that Carmichael had no objection to the government's unusual request. To now allow the ex parte communications to be objected to after-the-fact is a form of "sandbagging" that we will not permit in the absence of proof that the content of what was in fact communicated adversely affected Carmichael's substantial rights. *See United States v. Throckmorton*, 87 F.3d 1069 (9th Cir. 1996), where the district court was found to have erred in its ex parte communication with the jury, but the error did not require reversal because the defendant's "substantial rights" were not affected. *Id*. at 1073. The Ninth Circuit noted that the district court judge "disclosed in open court and on the record that he had communicated ex parte with the jury. If counsel had been concerned about this they could have voiced their concern to the district court and an appropriate record could have been made." *Id*.

The contents of the colloquy between the district court and the government have now been made available to both Carmichael's appellate counsel and to this court. We find nothing in the content of what was actually communicated

that adversely affected Carmichael's substantial rights, and therefore conclude that he has waived his right to raise this issue on appeal. This brings us back full circle to the rule of *Hernandez*, by which we are bound. We therefore find no merit in Carmichael's arguments relating to the failure of the district court to review the transcripts of Adams's wiretapped telephone conversations.

The dissent claims that we have distorted Sixth Circuit precedent in an effort to circumvent the teachings of *United States v. Minsky*, 963 F.2d 870 (6th Cir. 1992). Dis. Op. at 22-23. *Minsky,* however, does not flatly ban ex parte communications. The *Minsky* court noted that, if the government is able to meet its heavy burden of proving a lack of prejudice to the defendant, "there are circumstances where an ex parte communication might be 'overlooked.'" 963 F.2d at 874. Such is the case here. The government in *Minsky* was unable to articulate any justification for denying defense counsel the opportunity to participate in the conference, and the information discussed in the ex parte communication was found to constitute a *Brady* violation. *Id*. at 874-75. Here, in contrast, the government provided a reasonable justification for its request, defense counsel did not object, and we find nothing in the ex parte communications that adversely affected Carmichael's substantial rights.

The dissent also asserts that a "thorough reading of the record demonstrates an objection by Defendant." Dis. Op. at 24. A thorough reading of the record, however, establishes just the opposite. While counsel for both the government and the defense were at the bench, the government attorney asked to discuss the matter privately with the judge. In response, Carmichael's lawyer replied, "Well, Judge, that's your call." Then when the judge stated that he would see what the prosecution was referring to, defense counsel answered, "Yes, sir." If ever there appears to be a case of acquiescence, this is it. Defense counsel only objected to the district court's acceptance of the government's ex parte representations *after the fact*, not to the ex parte discussion itself that was done under defense counsel's very nose without objection.

_____

**DISSENT**

_____

DAMON J. KEITH, Circuit Judge, dissenting. The majority opinion is a distressing and total disregard for the meaning of the Sixth Amendment to the United States Constitution and the law of this Circuit. The right to effective assistance of counsel, as assured by the Constitution, "requires that a defendant be represented at every critical stage of his trial." *United States v. Minsky*, 963 F.2d 870, 874 (6th Cir. 1992) (citing *United States v. Cronic*, 466 U.S. 648, 659 n. 25 (1984)). This constitutional guarantee stands as a near absolute prohibition to *ex parte* conferences between the government and the district court. In keeping with this fundamental guarantee, I must express my deep disappointment and outrage with the majority's decision. Condoning *ex parte* discussions between the trial court and government cannot be tolerated, and I will not be a party to this miscarriage of justice. Accordingly, I respectfully dissent.

"The value of a judicial proceeding is substantially diluted where the process is *ex parte*, because the court does not have available the fundamental instrument for judicial judgment: an adversary proceeding in which both parties may participate." *Carroll v. President & Comm'rs of Princess Anne*, 393 U.S. 175, 183 (1968). This statement, articulated by the Supreme Court in 1968, is no less true today. Indeed, this Court adopted the Supreme Court's very words in espousing our distaste for *ex parte* proceedings. *See Minsky*, 963 F.2d at 874 (citing *Carroll*, 393 U.S. at 183).

In *United States v. Minsky*, this Court heard Gerald L. Minsky's ("Minsky") appeal from his convictions of mail and wire fraud and conspiracy to kill a horse for the insurance proceeds. 963 F.2d at 871. After two government witnesses testified against Minsky, Minsky requested, pursuant to the Jencks Act, 18 U.S.C. § 3500, that the prosecution produce

proposed instruction, and there was no further objection by counsel.

Carmichael has not identified any discernible error in the district court's instructions. *See* FED. R. CRIM. P. 30 ("No party may assign as error any portion of the charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which that party objects and the grounds of the objection."); *Pena v. Leombruni*, 200 F.3d 1031, 1035 (7th Cir. 1999) (discussing analogous Civil Rule 51) ("An objection to instructions is forfeited by a failure to state distinctly . . . the grounds of the objection. It is not enough to propose a correct instruction.") (brackets, internal quotation marks, and citation omitted), *cert. denied*, 120 S. Ct. 2207 (2000).

In the present case, the indictment contained only two counts, and there is no question that the jury already knew which count pertained to which conduct. Regarding the proposed additional instruction that the jury not speculate about "the evidence pertaining to Count One," we find it difficult to understand how Carmichael's proposal would have clarified what he claims was an unclear instruction. We therefore conclude that Carmichael has failed to preserve his objections to the jury instructions, and we find no plain error of the type that would authorize us to overturn the district court's ruling in the absence of a proper objection. *See United States v. Olano*, 507 U.S. 725 (1993) (explaining the proper function of the "plain error" rule under the Federal Rules of Criminal Procedure).

## III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** Carmichael's conviction.

The dissent further argues that Carmichael's substantial rights were adversely affected "because the government made misstatements during the *ex parte* communication that, if corrected, would have prompted the district court to review the documents *in camera*." Dis. Op. at 27. Aside from the speculative nature of such a conclusion, there is no basis to believe that the documents in fact would have been of any value to Carmichael in impeaching Adams's testimony. The government affirmatively represented to the contrary, and the district court was within its rights to accept the government's representation. *See Hernandez*, 31 F.3d at 360-61.

Finally, we cannot help but note the strident tone adopted by the dissent, asserting the majority's "total disregard for the meaning of the Sixth Amendment," Dis Op. at 21, our purported "desecrat[ion]" of the oath "to serve as protectors of the United States Constitution," Dis. Op. at 29, and the dissent's unwillingness to "be a party to this miscarriage of justice." Dis. Op. at 21. We find such rhetoric to shed more heat than light on the issue before us, and we respectfully suggest that none of these accusations is justified. In the end, the only thing "desecrated" by such language is collegiality.

## C.  Sufficiency of the evidence

In order to convict Carmichael of violating the Hobbs Act, the government had to prove that Carmichael wrongfully obtained or attempted to obtain property from Adams, and that he did so either under "color of official right," or "by wrongful use of actual or threatened force, violence, or fear." *See* 18 U.S.C. § 1951(b)(2). Carmichael argues that the government failed to prove either of these elements beyond a reasonable doubt. In reviewing challenges regarding the sufficiency of the evidence presented to the jury, we are limited to ascertaining whether, viewing the evidence in the light most favorable to the government, *see United States v. Talley*, 164 F.3d 989, 996 (6th Cir.), *cert. denied*, 526 U.S. 1137 (1999), "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

*Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

Carmichael argues that there was insufficient evidence for a jury to conclude that he attempted to obtain property from Adams under color of official right because there is no evidence that Carmichael ever explicitly told Adams words to the effect that "if you do not give me money, I will see to it that you are prosecuted." The short answer is that under the Hobbs Act, "[t]he official and the payor need not state the quid pro quo in express terms . . . . [O]therwise the law's effect could be frustrated by knowing winks and nods." *See Evans v. United States*, 504 U.S. 255, 274 (1992) (Kennedy, J., concurring). A jury could reasonably have found that the "understanding" Carmichael had with Adams was that Adams would make substantial cash payments to Carmichael in exchange for Carmichael continuing to let Adams conduct his illegal gambling operations without the risk of being prosecuted by Carmichael.

Carmichael also asserts that "none of the [police] officers involved testified that the Defendant prohibited, discouraged, or otherwise stalked [sic] any attempt by any agency to pursue criminal charges against Adams for his illegal gambling or anything else." From there, Carmichael reasons that "[c]learly, if there had been a deal of any kind, the involved officers would have noted such deals in their investigative reports." This argument is meritless for several reasons. Without being exhaustive, one of those reasons is that Carmichael, and not any of the police officers, was the public official who would ultimately have been responsible for prosecuting (or not prosecuting) Adams. Another reason is that under the Hobbs Act, a public official who has demanded funds in exchange for official action or inaction need not make good on his end of the quid pro quo in order for his demand to be considered extortion. *See Evans v. United States*, 504 U.S. 255, 268 (1992) ("[T]he offense is completed at the time when the public official receives a payment in return for his agreement to perform specific official acts;

absent from the Hobbs Act, the ordinary criminal law rule that "ignorance of the law is no excuse" applies), *aff'd*, 636 F.3d 1211 (3d Cir. 1980); *see also Evans v. United States*, 504 U.S. 255, 268 (1992) ("We hold today that the Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts."). To the extent that Carmichael is arguing that the district court was required to instruct the jury that, in order to convict Carmichael, it had to conclude that Carmichael intended to violate the Hobbs Act, we reject the argument as unsupported by the law.

Carmichael also argues that the district court erred by only requiring that the jury find that Carmichael's behavior made Adams fearful, and not that Carmichael intended his behavior to inspire this fear. This argument is not supported by the record. The district court instructed the jury that "it is enough if the public official knew that the person giving him the thing of value had the expectation that the public official would extend some benefit or refrain from some harmful action in return for the thing of value." We find the instruction to be a correct statement of what Carmichael must have known in order to be guilty of extortion under the Hobbs Act.

In addition, Carmichael asserts that the district court's instruction to the jury regarding the dismissed count of the indictment was defective. The district court instructed the jury that Carmichael was "only on trial for the particular crime charged in the indictment," and that the jury's job was "limited to deciding whether the government has proved the crime charged." In addition, the district court gave the instruction that "for reasons that you should not consider [or] speculate about, Count One of the indictment is no longer for your consideration." Carmichael requested that the district court also instruct the jury that the dismissed count of the indictment "involved the testimony regarding the Christmas decorations," and that the jury "should not speculate regarding the evidence pertaining to Count One." The district court rejected both requests. There was no attempt by counsel to explain what, in his opinion, was wrong with the court's

*Express, Inc.*, 194 F.3d 708, 716-17 (6th Cir. 1999) (concluding that the Supreme Court's decision in *General Electric Co. v. Joiner*, 522 U.S. 136 (1997), silently overruled this court's "heretofore well-settled precedent that hearsay evidentiary rulings are reviewed de novo" and requires abuse-of-discretion review). We conclude, however, that the district court's ruling on this issue should not be disturbed under either standard.

### E.  Jury instructions

Carmichael argues that the district court's instructions to the jury were faulty in two respects. First, he asserts that the district court's instructions regarding specific intent were defective.  Second, he contends that the district court, after directing a judgment of acquittal on Count I of the indictment, failed to appropriately instruct the jury not to consider evidence that related to the dismissed count during its deliberations on Count II.

Carmichael's argument regarding the lack of a specific-intent instruction appears to be based on *United States v. Collins*, 78 F.3d 1021, 1033 n.9 (6th Cir. 1996), which he cites for the proposition that the district court was required to instruct the jury that, in order to convict Carmichael, it had to conclude that he intended to violate the law.  In *Collins*, which was a Hobbs Act case, this court observed in a footnote that the jury had received "the standard instruction" on specific intent, i.e., that "the government must prove beyond a reasonable doubt that the defendant knowingly did an act which the law forbids or knowingly failed to do an act which the law requires, purposely intending to violate the law." *Id*.

The *Collins* court did *not* hold that this instruction was required.  In fact, a number of other courts have concluded in Hobbs Act cases that it is not.  *See, e.g., United States v. Arena*, 918 F. Supp. 561, 569 (N.D.N.Y. 1996) (concluding that a conviction for Hobbs Act extortion does not require a finding of specific intent); *United States v. Furey*, 491 F. Supp. 1048, 1058-59 (E.D. Pa.) (concluding that because words such as "knowingly" or "willfully" are conspicuously

fulfillment of the quid pro quo is not an element of the offense.").

Carmichael also points out that "[t]he taped conversations are devoid of references by the Defendant to his elected position, his law enforcement status, his power to prosecute, or any other authority."  He appears to be suggesting that in order for a public official to extort money from someone under color of official right, the official must explicitly remind the victim that he is a public official, and that he has the power to make bad things happen to the victim if he does not accede to the official's explicit or implicit demand for payment.  Carmichael cites no authority to support such an argument, and we reject it.  In any event, there can be no question in the case before us that Adams was well aware of Carmichael's position and his power to prosecute Adams.  Indeed, this was the very reason that Adams had his attorney contact Carmichael shortly after Adams was charged with a new offense in late 1997.

Carmichael also asserts that there was no evidence that Carmichael attempted to obtain property from Adams by "wrongful use of actual or threatened force, violence, or fear."  The jury, however, could reasonably have found that the intended implication of Carmichael's request for a very large cash contribution was that if Adams did not pay, Carmichael would cause Adams to be arrested and prosecuted, or would assist federal authorities in prosecuting Adams. We therefore conclude that the government produced sufficient evidence for a rational jury to convict Carmichael of violating the Hobbs Act.

### D.  Challenge to the exclusion of a defense witness

Carmichael proffered the testimony of David Guffy, the detective assigned to Carmichael's office.  If called to the stand, Carmichael argues, Det. Guffy would have testified that Carmichael had said that he was trying to set Adams up for making illegal campaign contributions.   Because Carmichael allegedly told this to Det. Guffy before Carmichael had any reason to know that law enforcement

officials were investigating him, Carmichael claims that Det. Guffy's testimony would have made the jury more apt to believe Carmichael's explanation that his apparent extortion of Adams was in reality an attempt to conduct a legitimate covert investigation of Adams. The district court, following a colloquy with counsel about Det. Guffy's proposed testimony, concluded that it would be inadmissible hearsay. Because of this ruling, Carmichael did not call Det. Guffy to testify.

We agree with the district court that Det. Guffy's testimony would have been hearsay. *See* FED. R. EVID. 801(c) (defining "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."). Carmichael, in fact, concedes that Det. Guffy's testimony was intended to show not just that Carmichael *told* Det. Guffy that he was investigating Adams, but "that [Carmichael actually] was conducting his own investigation of Adams."

Had Carmichael taken the stand, Det. Guffy's testimony might have been admissible as a statement consistent with Carmichael's testimony and offered to rebut a charge that Carmichael had only recently fabricated the idea that he was investigating Adams. *See* FED. R. EVID. 801(d)(1) (providing that a witness's statement that is "consistent with the declarant's testimony and . . . offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive" is not hearsay if the declarant testifies and is subject to cross-examination regarding the statement). But Carmichael did not testify, and a major reason for the prohibition on hearsay evidence is precisely to prevent litigants from introducing second-hand statements about what they were thinking or doing without subjecting themselves to cross-examination. *See, e.g.*, *Anderson v. United States*, 417 U.S. 211, 220 (1974) ("The primary justification for the exclusion of hearsay is the lack of any opportunity for the adversary to cross-examine the absent declarant whose out-of-court statement is introduced into evidence."); *Cannady v. United States*, 351 F.2d 796, 798

(D.C. Cir. 1965) ("The purpose of the hearsay rule is to prohibit the use of . . . unsworn, uncross-examined testimony as substantive evidence in a case.").

Whether Det. Guffy's testimony might also have been admissible, as Carmichael now argues, under the exception to the hearsay rule that permits the admission of statements regarding a declarant's "then existing state of mind [or] emotion," FED. R. EVID. 803(3), would appear to be a reasonably close question. Admissibility under Rule 803(3) does not depend on whether Carmichael was available as a witness. *See* FED. R. EVID. 803. The argument that Det. Guffy's testimony was admissible under Rule 803(3), however, was not advanced in the district court. *See Pinney Dock & Transport Co. v. Penn Central Corp.*, 838 F.2d 1445, 1461 (6th Cir. 1988) ("'It is the general rule . . . that a federal appellate court does not consider an issue not passed upon below.'") (quoting *Singleton v. Wulff*, 428 U.S. 106, 120 (1976)).

In any event, even if Carmichael had raised this argument in the district court, we have doubts whether Det. Guffy's testimony would have been admissible under Rule 803(3). *See United States v. LeMaster*, 54 F.3d 1224, 1231 (6th Cir. 1995) (observing that in order for a statement to be admissible under Rule 803(3), "the declarant must not have had an opportunity to reflect and possibly fabricate or misrepresent his thoughts"). It is not beyond the realm of possibility that Carmichael intended to extort money from Adams, but had misrepresented his thoughts to Det. Guffy in an attempt to hedge his bet in the event that something might go wrong later, even if Carmichael did not know at the time that he was the target of an investigation.

The applicable standard of review regarding rulings on hearsay evidence appears to be somewhat unsettled within the circuit. *Compare Stalbosky v. Belew*, 205 F.3d 890, 894 (6th Cir. 2000) (observing that this court has traditionally reviewed de novo district court conclusions about whether proffered evidence is hearsay) *with Trepel v. Roadway*